# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

_____
                                      )
In re:                                )
                                      )
LARRY J. LIATOS,                      )
                                      )          Case No. 10-75879-SCS
        *Debtor.*                     )
_____)
                                      )
LYNNE C. MILLER,                      )
                                      )          APN 11-07052-SCS
        *Plaintiff,*                  )
                                      )
v.                                    )
                                      )
LARRY J. LIATOS,                      )
                                      )          Chapter 7
        *Defendant.*                  )
_____)

## MEMORANDUM OPINION

This matter came on for trial upon the Complaint of Lynne C. Miller ("Miller") against Larry

J. Liatos ("Liatos") on October 25, 2011, and was concluded on March 27, 2012.[1]  The Complaint

("Complaint") seeks a determination that an indebtedness owed by Liatos to Miller arising from the

purchase of a 1976 Chevrolet Corvette automobile ("Corvette") is not dischargeable pursuant to 11

---

[1] The substantial gap between trial days was necessitated by the fact Miller attempted to introduce affidavits from two witnesses who were unavailable for trial, which admission was objected to by Liatos.  Because Miller was unrepresented and had issued subpoenas to these witnesses to appear and testify at trial, the Court continued the trial to provide Miller with an opportunity to reissue and serve subpoenas upon the two witnesses.  October 25, 2011 Trial Transcript (hereinafter "First Tr.") at 46.  The trial was continued to February 22, 2012.  On November 10, 2011, Miller moved to continue the trial date as one of the subpoenaed witnesses advised he was not available at any time in February 2012 because of a travel commitment.  At a hearing held on December 22, 2011, which both Miller and counsel for Liatos attended, the Court granted the motion.  The Court's ruling was memorialized by order entered on December 23, 2011, which continued the trial to March 27, 2012.  The evidence and arguments of Miller and Liatos were completed on that date.

U.S.C. § 523(a).    Miller, who is unrepresented, alleges that Liatos committed fraud by making

misrepresentations as to the condition of the Corvette at the time Miller purchased it from him in April

2009.    Miller also alleges Liatos should not be granted a discharge on the basis that he made false

statements regarding the value of his tools, claimed excessive expenses on his bankruptcy schedules,

and exceeded the statutory exemption limits regarding his tools.    Liatos denies these allegations.    At

the conclusion of the trial on the continued trial date of March 27, 2012, the Court took the matter under

advisement.    This Memorandum Opinion constitutes the findings of fact and conclusions of law of this

Court pursuant to Federal Rule of Civil Procedure 52, as incorporated into the Federal Rules of

Bankruptcy Procedure by Rule 7052.[2]

## I.  The Complaint

The Complaint here is brief in its specific allegations but also incorporates a number of

documents attached thereto as exhibits.    The obligation of the Court to liberally construe pleadings filed

by unrepresented parties is well-established in the case law of the Fourth Circuit Court of Appeals and

the United States District Court for the Eastern District of Virginia.    *See, e.g.*, *Beaudett v. City of

Hampton*, 775 F.2d 1274, 1277-78 (4th Cir. 1985); *Taylor v. First Premier Bank*, 841 F. Supp. 2d 931,

933 (E.D. Va. 2012); *Thompson v. New Mexico Student Loan Guarantee Corp.* (*In re Thompson*), 329

B.R. 145, 167 (Bankr. E.D. Va. 2005).    As one court has aptly noted "a *pro se* complaint . . . must be

construed liberally . . . with sufficient sensitivity 'so as to do justice' as required by Rule 8(e) of the

Federal Rules of Civil Procedure . . . ."    *Carvel v. Ross*, No. 09 Civ. 0722, 2011 WL 856283, at *6

(S.D.N.Y. Feb. 16, 2011) (Report & Recommendation), *adopted by* 2011 WL 867568 (S.D.N.Y. Mar.

---

[2] On September 22, 2011, Miller filed a Motion for Summary Judgment, which the Court
scheduled for hearing on the trial date.    Prior to the presentation of any evidence at trial, Miller
moved for entry of summary judgment.    For the reasons stated from the bench, the Court found
that disputed factual issues were present and, accordingly, denied the motion.    First Tr. at 4-5.

11, 2011) (unreported decision).

The Complaint appears to seek a finding that Liatos should not receive his discharge because certain monthly expenses he claimed on his bankruptcy schedules are excessive, he made certain misrepresentations regarding the value of tools he owns, and he exceeded the statutory exemption limits regarding his tools.  The allegations regarding the Corvette are contained primarily within the exhibits attached to the Complaint.  Principal among those exhibits is the advertisement Liatos placed on the Craigslist website soliciting the sale of the Corvette ("Ad").  Compl. Exh. 1, Craigslist Ad.  The Ad is lengthy, comprising over three pages of descriptions and photos of the Corvette.[3]  Also attached to the Complaint as exhibits are a summary of expenses Miller purportedly incurred related to the Corvette; copies of Schedules C and J filed by Liatos in the main bankruptcy case; and a document entitled "Memorandum of Points."   In the Memorandum of Points, Miller recites that she purchased the Corvette from Liatos, who provided her with a list of the work he had performed on the car.  Compl. Exh. 3, Memorandum of Points.  Miller alleges that upon inspection, other mechanics informed her that the repairs on the list prepared by Liatos were not completed or were completed in an incorrect manner. *Id*.  Miller alleges that she attempted to contact Liatos to reach a resolution regarding the costs she incurred repairing certain items Liatos had represented as completed, but Liatos did not respond.  *Id*. Miller filed a lawsuit in state court in Virginia Beach, Virginia ("State Court"), in 2010, where she was awarded judgment in the amount of $4,563.56.  *Id*.  Miller attempted to collect the judgment amount in October 2010 through a garnishment.  *Id*.  Miller appeared in State Court on the return date for the

---

[3] Because of the centrality of the Ad, which was admitted without objection as Plaintiff's Exhibit 1-A at trial, it is reproduced in its entirety in Appendix A.

garnishment proceedings and at that time was informed Liatos had filed for bankruptcy.[4]  *Id*.  The State

Court instructed Miller to file the instant Complaint.  *Id*.  Miller represents that the State Court remains

in possession of the funds collected pursuant to the garnishment.  *Id*.  According to the Adversary

Proceeding coversheet filed with the Complaint, Miller is seeking a determination that the amount of

$4,734.42 is nondischargeable.  She is also seeking interest upon that amount plus reimbursement of

the fee for filing the instant Complaint ($250.00), for a total of $4,984.00 plus interest.  Liatos, by

counsel, filed an Answer to Miller's Complaint in which he denies all allegations.

Based upon Miller's apparent allegations, and in light of the prevailing case law in the Fourth

Circuit regarding pleadings filed by parties proceeding *pro se*, the Court will consider Miller's claims

with regard to the Corvette pursuant to Sections 523(a)(2)(A), 523(a)(2)(B), and 523(a)(6) of the

Bankruptcy Code, and her claims that Liatos should be denied his discharge pursuant to Section

727(a)(4) of the Bankruptcy Code.[5]

## II.  Findings of Fact

Miller's first witness was her husband, Tony Miller ("Mr. Miller").  Mr. Miller was present at

the initial meeting between Miller and Liatos to view the Corvette, which was stored "on blocks" and

inoperable at the time.  First Tr. at 6, 7.  Mr. Miller "asked [Liatos] if anything was wrong with the car

and he said, no, the car was fine. . . . I said if anything is wrong with the car, let me know because I

---

[4] Liatos filed his petition under Chapter 7 of the Bankruptcy Code in this Court on December 15, 2010.

[5] On September 22, 2011, Miller filed a document entitled "Plaintiff's Stipulations of Fact."  On October 5, 2011, Liatos, by counsel, filed a Response to Plaintiff's Stipulations of Fact," wherein he stated that he had not agreed to any of Miller's proffered stipulations of fact. Finding at trial that the stipulation was not agreed to by Liatos, the Court instructed Miller that she could testify as to the any statement contained therein that she wished the Court to consider as evidence.  First Tr. at 35-36.

probably wouldn't be getting it because I don't know nothing about mechanics." *Id.* at 6.  Liatos advised Mr. Miller he was a mechanic at Oceana Naval Air Station.  *Id.*  Miller and Mr. Miller inspected the Corvette to verify that some of the work listed in the Ad had been done.  *Id.* at 10.

Miller's second witness was Joe Jeffries ("Jeffries"), an auto instructor at ATI Institute.  *Id.* at 12.  Jeffries testified he worked on the Corvette after its purchase by Miller to fix an overheating problem.  *Id.* at 12-13.  To fix this problem, "radiator ducting had to be put in, the coolant fans had to be installed properly and the water pump had to be replaced."  *Id.* at 13.  Jeffries described other problems with the Corvette he found and remedied, including an improperly wired auxiliary fuse panel; a window regulator that needed to be replaced; an improperly wired motor switch for the same window; a hood that did not fit because it was warped and had to be replaced; a leaking master cylinder; an improperly installed capacitor in the brake light circuit that Jeffries stated caused a fire hazard; and an improperly installed parking brake shoe that caused a rotor to break and have to be replaced.  *See id.* at 13-17.  Jeffries described the wiring issues as "egregious."  *Id.* at 22.  Jeffries testified that the transmission did not seem to have any problems: "[T]he physical condition of the transmission looked like it is brand new and the shifting pattern on the transmission is absolutely perfect.  The [transmission] works just like it is supposed to. . . .  It has obviously been replaced."  *Id.* at 17.  Jeffries reasserted on cross-examination his opinion as to the condition of the transmission in the Corvette:

Q.  . . . The transmission, you said the quality of the transmission was in good shape—

A.  Yes.

Q.  —when you saw it?

A.  When I got the car. Yes.

*Id.* at 19.

5

Miller testified that after she made the final payment for the Corvette in April 2009, Liatos brought a flat bed truck to move the vehicle from where it was being stored, and he experienced difficulty getting the Corvette into gear.  Miller asked Liatos, "'Is there a problem with this car, with this transmission?' And he said, 'No.  It is the linkage adjustment.'"  *Id*. at 24, 36.  Liatos also had difficulty getting the Corvette off the flat bed truck at its destination, a muffler shop.  He reiterated to Miller that a linkage adjustment was needed.  *Id*. at 25.  After installation of an exhaust system, the muffler shop advised Miller they could not get the Corvette into gear.  *Id.*  Miller hired a wrecker to transport the Corvette to Virginia Speed Shop, where the transmission was removed from the car for inspection.  *Id*. at 25-26.  After the inspection, Miller was advised the transmission was "shot" and had to be rebuilt or replaced; Miller opted to replace the transmission.  *Id*. at 26.  After installation of the replacement transmission, Miller had to replace items relating to the cooling system, including a leaking evaporator core.  *Id*. at 28-29.

Miller testified that "based on the [A]d . . . the things that [Liatos] said he did and the fact that he was a trained mechanic is, Number 1, what enticed us to buy this car based on this information . . . ."  *Id*. at 27.  She further represented that "relying on the [A]d, had we known we would have to put this much money in the car . . .  it wasn't worth it for us but at that time we didn't know, we were relying on the [A]d as well as the verbal conversation we had with Mr. Liatos trusting him that he was a good mechanic."  *Id*. at 30.  After failing in her attempts to work out a compromise with Liatos, *id*. at 34, Miller sought and obtained judgment against him in Virginia Beach General District Court, *id*. at 37.[6]

_____

[6] Miller represented in her pleadings that she obtained a judgment against Liatos in a Virginia General District Court in the amount of $4,563.56.  Compl. Exh. 3, Memorandum of Points.  The General District Courts of the Commonwealth of Virginia do not routinely record or transcribe their proceedings.  *See* Va. Code Ann. § 16.1-69.5 (defining "Courts not of record" to

As to her contention Liatos falsely represented the value of his tools on his bankruptcy schedules, Miller referenced a picture of the Corvette in the Ad in which some tools are visible. *Id*. at 39. Miller argues that in her opinion, it is likely that the value of the tools owned by Liatos exceeds the $2,000.00 value he scheduled since he is a mechanic. *Id.* Miller's testimony as to Liato's budget was equally vague, stating, "I am into a lot of budgets as far as my profession and they [the expenditures of Liatos] looked out of line to me." *Id.* Miller also alluded to the monthly expense Liatos listed on his Schedule J for electricity but offered no specific evidence on this point other than a general reference that the monthly expenses she and Mr. Miller incur are lower than those represented by Liatos. *Id*. at 40.[7]

Upon resumption of the trial, Miller called Leo Glen Davis ("Davis") of Beach Radiator and Air Conditioning as a witness. Davis testified that he "pressure tested an evaporator core that [] Miller had removed from the vehicle and brought to us to pressurize to verify that it leaked." March 27, 2012 Trial Transcript (hereinafter "Second Tr.") at 6. Davis provided further detail about the leaking evaporator core, stating that he could not identify whether that evaporator core was new or used: "It [the removed evaporator core] appeared to be very clean, you know, without a doubt. I don't—I cannot confirm the status of it being brand new or, you know, preexisting, as far as being used or not . . . ." *Id*. at 10. Davis elaborated, "[A]t the time we were surprised because we were under the impression

---

include General District Courts). There is no evidence as to any specific findings made by the State Court, and no transcript of that proceeding was produced for review by this Court.

[7] At the conclusion of Miller's presentation of evidence on the first day of the trial, counsel for Liatos made an oral motion for a directed verdict (more properly known as a motion for judgment as a matter of law), asserting that the elements of fraud had not been established. First Tr. at 41-42. In light of the determination that Miller should be afforded the opportunity to reissue and serve subpoenas upon the two witnesses who failed to appear on the first day of trial, the Court found that the evidence should remain open and did not rule upon the oral motion.

that it was a new evaporator core, but being in the parts business, installation of—of new parts, there

is—there is error, you know, in manufacturing, so it could have very well been a brand new part, sir,

that was—you know, that had a hole in it." *Id*. at 11.

Davis also pressure tested a new evaporator core purchased by Miller prior to its installation

in the Corvette.[8]  *Id.* at 6.  When Davis again inspected the new evaporator core after Miller had it

installed, Davis found that the Corvette was overheating.  *Id*. at 7.  Miller declined to have Davis

inspect the entire cooling system on the Corvette.  *Id*. at 8-9.

Miller then called Bucky Wedeman ("Wedeman") as a witness.  Wedeman has operated a

transmission shop for thirty-eight years.  *Id*. at 12.  Wedeman and his technician disassembled and

inspected the transmission ("Transmission"), which had been removed from the Corvette. *Id*. at 13-14;

*see also id*. at 15-16.  The inspection revealed the Transmission was worn out:  "All the gears in it, first,

second, third and fourth gears, were wore slam out.  Where the synchronizers hook—synchronizers

hook up with the transmission gears, they were all wore out, along with the synchronizer.  About the

only thing in the transmission that we could use over would be the case."  *Id*. at 14.  On cross-

examination, Wedeman elaborated that the gears were "not reusable, not repairable" and had to be

replaced.  *Id*. at 16.  Miller ultimately purchased another transmission, which was installed by Virginia

Speed Shop.  *Id.*  Upon questioning by the Court, Wedeman testified the Transmission in the Corvette

at the time of his first inspection was not a rebuilt one.  *Id*. at 17-18.

Liatos was the final witness.  Liatos affirmed he told Miller and Mr. Miller he was a mechanic

---

[8] Davis testified he pressure tested the new evaporator core installed on the Corvette even
though that core was new:  "That [the new evaporator core] was purchased brand new, and a lot
of times when you're doing a part that has excessive labor, that you can pressurize, it's best to do
that because there could be a manufacturer's defect.  So the second evaporator was purchased
brand new and brought to us for inspection and pressurizing before installation . . . ."  Second Tr.
at 10.

at Oceana Naval Air Station and had a history of restoring Corvette automobiles. *Id*. at 20. Liatos

believes the Ad was correct and that everything was working properly on the Corvette "without being

able to, of course, take it for a test drive." *Id*. Liatos admitted there was difficulty with the

Transmission in the placement and removal of the Corvette on the flat bed truck and reiterated his belief

it was a shifting linkage adjustment problem. *Id*. at 21-22, 36-37. Liatos testified he had purchased

the Transmission in the Corvette as a rebuilt transmission from an advertisement in The Trading Post

in 2007 or 2008. *Id*. at 24, 34. Liatos elaborated upon examination by his counsel:

> Q. Mr. Liatos, regarding the [T]ransmission, how did you come across this transmission?
>
> A. I found an ad in The Trading Post for a rebuilt transmission, which I purchased and installed in that car.
>
> Q. Okay. What type of inspection did you do on the [T]ransmission once you got it, before you installed it, if anything?
>
> A. I didn't do any kind of inspection. It was a rebuilt transmission. Unless you disassemble it you really can't tell what's on the inside. As far as it being dirty, I don't know how because if you look at the pictures on these cars, especially some of the pictures she has of the—underneath of the car, that [T]ransmission was painted up nice and pretty before I installed it in the car, as well as the engine and everything else.
>
> Q. Okay. And who—who sold you this transmission?
>
> A. A person out of The Trading Post. If I would have still had the receipt, I would have given it to Ms. Miller.

*Id*. at 33-34. Liatos neither drove the Corvette nor did he attempt to manipulate the gears after

installing the Transmission. *Id*. at 35-36. The Corvette did not have an engine or transmission in it

when purchased by Liatos. *Id*. at 38.

Liatos also testified as to his disposal of tools:

> A. [A]s of right now I have sold the toolbox, along with all the tools in it, for $3,000.
>
> Q. And when did you sell those?

A.  I sold those within the last four to six months.

*Id*. at 30.

 Upon questioning by the Court, Liatos provided additional details about the purchase of the Transmission and the evaporator core installed in the Corvette at the time of its purchase by Miller. *See id*. at 34-40.  Without inspecting it, Liatos purchased the Transmission for $700.00 from a machinist in Chesapeake, Virginia, who represented to him that the Transmission was rebuilt.  Liatos did not keep a receipt for the purchase.  *Id*. at 37-38.  Liatos testified he installed the evaporator core, which he purchased new, and did not perform a pressure test on it prior to installation.  *Id*. at 38-39.

At the conclusion of Miller's presentation of evidence, counsel for Liatos advised the Court that he did not have any additional evidence to present, as the totality of his evidence was presented through the testimony of Miller and the examination of Liatos.  *Id*. at 40.

Miller's closing argument consisted of a recapitulation of her testimony and that of her witnesses, and the reiteration of the trust she and Mr. Miller placed upon the representations made by Liatos both verbally and in the Ad as to the condition of the Corvette.  *See id*. at 41-42.  Counsel for Liatos argued that Miller had not met her burden of proving Liatos made an intentional misrepresentation as to the condition of the Transmission because Liatos had relied on a third party's representations that the Transmission was rebuilt.  *Id*. at 42.  He further asserted that Miller had not met her burden of proving that Liatos misrepresented the overall quality and condition of the Corvette.  *Id*. at 43.  In rebuttal, Miller reemphasized the reliance she placed upon the representation Liatos made that he was a knowledgeable mechanic.  *Id*.  She also asserted that the argument that Liatos had relied on the third party's representation that the Transmission was rebuilt was irrelevant, as she and Mr. Miller had relied upon the representations Liatos made, not those of a third party.  *Id*. at 44.

10

III.  Conclusions of Law

This Court has previously examined the requirements of 11 U.S.C. §523 that must be proven

to determine that an indebtedness is nondischargeable:

> One of the most important benefits of the Bankruptcy Code is its ability to offer
> debtors a fresh start.  This concept of a fresh start demands that courts construe
> exceptions to discharge narrowly against the objecting creditor and in favor of the
> debtor.  *Gleason v. Thaw*, 236 U.S. 558, 561-62 (1915); *Foley & Lardner v. Biondo* (*In
> re Biondo*), 180 F.3d 126, 130 (4th Cir. 1999) (citing *Century 21 Balfour Real Estate
> v. Menna* (*In re Menna*), 16 F.3d 7, 9 (1st Cir. 1994)); *Rezin v. Barr* (*In re Barr*), 194
> B.R. 1009, 1016 (Bankr. N.D. Ill. 1996) (citing *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670,
> 674 (7th Cir. 1995)).  Courts balance this belief in a fresh start with the principle that
> "perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code."
> *In re Biondo*, 180 F.3d at 130 (citing *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998)).

The exceptions at issue in the instant case arise under 11 U.S.C. § 523, which
makes debts nondischargeable:

> (2)  for money, property, services, or an extension, renewal, or
> refinancing of credit, to the extent obtained by—
>
>> (A)  false pretenses, a false representation, or actual
>> fraud, other than a statement respecting the debtor's or
>> an insider's financial condition;
>>
>> (B)  use of a statement in writing—
>>
>>> (i) that is materially false;
>>>
>>> (ii) respecting the debtor's or an insider's
>>> financial condition;
>>>
>>> (iii) on which the creditor to whom the
>>> debtor is liable for such money, property,
>>> or services, or credit reasonably relied;
>>> and
>>>
>>> (iv) that the debtor caused to be made or
>>> published with intent to deceive[.]

11 U.S.C. §§ 523(a)(2)(A)-(B).

. . . Further, Section 523(a) requires that the plaintiff prove non-dischargeability

11

by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991); *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994); *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir. 1988); *Whitson v. Middleton* (*In re Middleton*), 100 B.R. 814, 818 (Bankr. E.D. Va. 1988).

*Elrod v. Bowden* (*In re Bowden*), 326 B.R. 62, 81-82 (Bankr. E.D. Va. 2005).

While seemingly asserted by Miller in support of her contention that the indebtedness of Liatos is not dischargeable, Section 523(a)(2)(B) is not applicable here, as the written statement, specifically, the Ad, relied upon by Miller to support that count is not a "statement in writing . . . respecting the debtor's or an insider's financial condition."[9]  Broadly construing the Complaint as the Court is bound to do in light Miller proceeding *pro se*, Miller also alludes to Section 523(a)(6) in her Complaint but offers no support for this contention in her Complaint or through her evidence.[10]  Therefore, to the extent that the Complaint could be construed as asserting causes of action pursuant to Sections 523(a)(2)(B) and 523(a)(6) of the Bankruptcy Code, the Court finds that those counts must be denied.

---

[9] This Court has previously explained that a broad approach is taken within the Fourth Circuit in determining what constitutes a written statement regarding financial condition:

> In *Engler v. Van Steinburg* (*In re Van Steinburg*), 744 F.2d 1060 (4th Cir. 1984), the Fourth Circuit took a broad approach as to what constitutes a statement regarding financial condition. *Id*. at 1060-61.  The Court points out that Congress did not speak merely in terms of "financial statements" but rather, "referred to a much broader class of statements—those 'respecting the debtor's financial condition.'" *Id*. at 1061.  Therefore, the court held that, while a statement that specific assets are unencumbered is not a "formal financial statement, such as a typical balance sheet or a profit and loss statement," such statement certainly qualifies as a statement of financial condition, since whether assets are encumbered "may be the most significant information about [the debtor's] financial condition." *Id*. at 1060-61.

*In re Bowden*, 326 B.R. at 91.  It is abundantly clear that the Ad here does not meet that requirement.

[10] Section 523(a)(6) prohibits the discharge of any debt arising from the willful and malicious injury by the debtor to another entity or to the property of another entity.  11 U.S.C. § 523(a)(6).

12

A. Section 523(a)(2)(A)

For a court to determine that a debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A), the plaintiff must prove the following elements:

(1) That the debtor made a representation;

(2) That at the time the representation was made, the debtor knew the representation was false;

(3) That the debtor made the false representation with the intention of deceiving the creditor;

(4) That the creditor relied on such representation; and

(5) That the creditor sustained the alleged loss and damage as the proximate result of the false representation.

*In re Bowden*, 362 B.R. at 82 (citing *Fowler v. Garey* (*In re Garey*), 258 B.R. 356, 360-61 (Bankr. E.D. Va. 2000); *Spinoso v. Heilman* (*In re Heilman*), 241 B.R. 137, 149 (Bankr. D. Md. 1999); *Parker v. Grant* (*In re Grant*), 237 B.R. 97, 112 (Bankr. E.D. Va. 1999); *Hecht's v. Valdes* (*In re Valdes*), 188 B.R. 533, 535 (Bankr. D. Md. 1995); *Clarkson v. Elibuyuk* (*In re Elibuyuk*), 163 B.R. 75, 76 (Bankr. E.D. Va. 1993)).

There is no implied warranty in the sale of a used car in Virginia:

The authorities appear to be of almost unanimous opinion that, independent of statute and in the absence of fraud, there is generally no implied warranty of quality or condition in the sale of a used car. 8 Am. Jur. 2d, § 655, p. 211; 77 C.J.S. Sales § 330, p. 1186, at p. 1199; Annotation 78 A.L.R. 2d 460, at p. 493. No statute touching upon the question exists in Virginia and no fraud is involved in this case.

*Smith v. Mooers*, 206 Va. 307, 313, 142 S.E.2d 473, 477 (1965). Thus, the Court must examine whether Liatos committed a fraud upon Miller in the sale of the Corvette.

Miller summarized her contentions as to the misrepresentations made by Liatos as follows:

[T]his car was—was bought with sole trust and representation based on the [A]d, number one, because we weren't able to take it for a test drive, the fact that Mr. Liatos

13

presented himself as a knowledgeable mechanic, and with his verbal response with my
husband that everything was working properly, and the question came up what work
does this car need because we wanted to know what our total costs would be in this car,
and he said, well, I listed it there, the ten items—I think it was on [Plaintiff's Exhibit]
1-A—that were needed to complete the car.

Second Tr. at 41.

### B.  Did Liatos Make A Misrepresentation?

#### 1.  The Ad

Distilling Miller's contentions as to the alleged misrepresentations made by Liatos is

challenging, especially given what appears to be an unusual breadth of information disclosed by Liatos

in the Ad for the sale of a used automobile.  In examining Miller's complaints about the Corvette, there

appear to be five principal areas of contention that a misrepresentation as to the Corvette occurred in

the Ad.

#### a.  The Transmission

The Ad describes the Transmission for the Corvette as "Rebuilt M-21 4 speed Trans with new

hurst linkage, new back up light switch, bracket and linkage. New reverse lockout cable and brackets."

Plaintiff's Exh. 1-A.  The testimony of Wedeman convinces the Court that the Transmission installed

on the Corvette was not a rebuilt transmission.  Second Tr. at 17-18.  The testimony by both Miller and

Liatos that the latter experienced difficulty in placing and removing the Corvette onto the flat bed truck

also supports this finding.  Accordingly, the Court finds that the Ad contains a misrepresentation as to

the Transmission.

#### b.  The Evaporator Core and the Cooling Issues

The Ad states the Air Conditioning System for the Corvette has a "[n]ew . . . evaporator."

Plaintiff's Exh. 1-A.  Liatos testified under oath that he purchased and installed a new evaporator core

on the Corvette.  Second Tr. at 38-39.  There is no evidence to controvert this testimony.  While the

evidence shows the evaporator installed in the Corvette was leaking and had to be replaced, *id*. at 6, Davis was unable to conclusively determine whether or not the evaporator core removed from the Corvette was new.  *Id*. at 10.  Accordingly, there is no evidence that the evaporator core installed by Liatos in the Corvette was other than "new," and the Court must conclude that there was no misrepresentation as to the evaporator core in the Ad.

### c.  The Items Required to Complete the Corvette

The Ad provides the following statements about the work needed to complete the restoration of the Corvette:

THINGS NEEDED TO COMPLETE THIS CAR

1.  Exhaust system (I have new hooker mufflers that come with the car).

2.  Wheel alignment

3.  Engine fine tuned (engine runs already, but will just need this after exhaust installed)

4.  Small crack in windshield.  Will pass VA State inspection w/o replacing it.

5.  Paint it your color.  Note:  I replaced the hood with a twin turbo hood for more clearance under the hood.  Also, old hood had a large hole cut in it from previous owner.

6.  Manufacture and install a/c line for a/c compressor and charge a/c system.

7.  Finish installing seats, center console, and door panels (I have all these parts already).

(Items 1 through 7 are referred to herein as the "Completion Items.").  Plaintiff's Exh. 1-A.

There is no evidence that the Completion Items were false; there is also no evidence that these tasks did not, in fact, need to be completed to finish the restoration of the Corvette.  Rather, Miller complains that this list was incomplete and did not contain other items she later learned needed to be done to complete the car's restoration.  It is somewhat unclear what all these additional items were, but Miller appears to believe that all of the items she subsequently had to replace or repair on the Corvette

15

should have been listed.  In the context of the Ad, it was arguably unreasonable for Miller to construe the Completion Items as an exclusive list of the tasks to complete the Corvette's restoration instead of a recitation of the items that, to the knowledge of Liatos, were needed to complete restoration. However, the Ad also contains the caveat that "there are probably some things that I have forgotten to list here." *Id*.  In this instance, the Court will give Miller the benefit of the doubt and find that the list of Completion Items constituted a misrepresentation.

### d.  The Other Defects

Jeffries testified as to extensive problems he found with the Corvette.  Those problems included an overheating problem, which Jeffries fixed by installing radiator ducting, properly installing the cooling fans, and replacing the water pump.  First Tr. at 12-13.  Jeffries also found and remedied an improperly wired auxiliary fuse panel; a defective window regulator; an improperly wired motor switch for the same window; a warped, ill-fitting hood; a leaking master cylinder; an improperly installed capacitor in the brake light circuit; and an improperly installed parking brake shoe that required a rotor to need replacement. *See id*. at 13-17.

An examination of the Ad shows the following was stated as to the cooling system on the Corvette:

HEATING AND COOLING—

Radiator cleaned, pressure tested and painted, new heater core, heater control valve, upper and lower radiator hoses, thermostat, heater blower motor, vacuum lines, braided steel heater hoses, as well as 2 electric cooling fans for engine and A/C system and new water pump.  New overflow bottle with hoses and new radiator cap.

Plaintiff's Exh. 1-A.  The Ad does not contain any representation as to the radiator ducting but does state that two engine cooling fans were installed. *Id*.  However, it makes no representation as to the correctness of the installation or the quality of the workmanship of Liatos in the installation of the

engine cooling fans.  No evidence was adduced as to the water pump in any regard as to its age or any

other quality.

With regard to the other problems Jeffries found with the Corvette, an examination of the Ad

reveals the following.  To begin, there are no representations as to the auxiliary fuse panel or any

electrical panel in the Ad.  Further, there are no representations in the Ad concerning the capacitor in

the brake light circuit.

The Ad states the doors contain "[r]ebuilt power window regulators." *Id*.  The fact the window

regulator had to be replaced by Miller does not prove a window regulator other than one represented

as "rebuilt" was installed on the Corvette prior to Miller's purchase.  Thus, there is no evidence the Ad

contained a misrepresentation as to the window regulator.  As to the window motor switch, the Ad

states the car has "[n]ew . . . power window switches." *Id*.  Jeffries testified that the window motor

switch was improperly wired; he did not testify as to any other qualities of the window motor switch,

including its age.  There is no other evidence in the record that the switch was misrepresented as "new,"

and the Ad makes no representation that Liatos properly installed the window switch.  Liatos also noted

in the Ad that he replaced the Corvette's hood with a "twin turbo hood." *Id*.  There is no other

representation concerning the hood, its condition, or its appropriateness for use on the Corvette.

The Ad states the Corvette has a "[r]ebuilt . . . master cylinder." *Id*.  There is no evidence this

is a misrepresentation as to the master cylinder.  The fact the master cylinder was apparently leaking

and had to be replaced does not prove that a master cylinder other than one represented as "rebuilt" was

installed on the Corvette prior to Miller's purchase.  According to the Ad, the Corvette has a "new

stainless steel emergency brake system."[11] *Id*.  Jeffries testified that an improperly installed parking

---

[11] The Court believes the "emergency brake system" is in fact the same as the "parking
brake" described by Jeffries.

17

brake shoe on the left rear wheel caused a broken rotor.  There is no evidence the parking brake was

other than new, and there is no evidence that Liatos made any representation that the parking brake had

been properly installed.

Accordingly, it does not appear that Liatos made any misrepresentations in the Ad regarding

the parts Jeffries testified he repaired or replaced.

### e.  Experience as a Mechanic

In the Ad, Liatos states, "I have over 30 years of experience as a mechanic (five of those years

restoring Corvettes)."  *Id.*  Miller and Mr. Miller testified that they relied upon this represented

experience in purchasing the Corvette and presumed the work Liatos had performed on the car was

competent as a result of his experience.  There is no evidence in the record here that these statements

by Liatos were untrue or misrepresentations.  It is logical that Miller assumed the work Liatos

completed on the Corvette was well done due to this experience, but the statement by Liatos regarding

his three decades of experience as a mechanic does not give rise to an express or implied warranty that

all the work performed by Liatos on the Corvette was performed in a workmanlike manner.[12]

---

[12] A number of decisions have concluded that a misrepresentation of a professional license is culpable under Section 523(a)(2)(A).

> [W]hen an individual asserts that he possesses a refrigeration license, whether it be an apprentice's license, a journeyperson's license, or a master's license, he is making a representation that he possesses the necessary level of skill and knowledge to perform refrigeration and air conditioning work.  A misrepresentation as to whether a debtor has such a license goes to the very essence of the agreement, *i.e.*, the reliance by the contracting party that the debtor has the requisite knowledge, experience, and training to properly complete the work.  *Parker v. Grant* (*In re Grant*), 237 B.R. 97, 119 (Bankr. E.D. Va. 1999). *See also Kendrick v. Pleasants* (*In re Pleasants*), 231 B.R. 893, 898 (Bankr. E.D. Va. 1999) ("Professional licenses carry with them a degree of presumed competence . . ."); *Bottari v. Baiata* (*In re Baiata*), 12 B.R. 813, 820 (Bankr. E.D.N.Y. 1981) ("The incidence of license conveys to lay persons a concept of authority and standards of workmanship impacting on reliance.").

18

Accordingly, the Court finds that the statements made by Liatos regarding his experience as a mechanic and in restoring Corvettes were not misrepresentations.

### 2.  The Oral Alleged Misrepresentations

#### a.  Experience as a Mechanic

As set forth previously with respect to the written statement by Liatos as to his experience as a mechanic and Corvette restorer, there is no evidence here that these statements were false.  Further, these statements do not give rise to any type of warranty, express or implied, regarding the quality of the work performed by Liatos on the Corvette.  *See Owen v. Angst* (*In re Angst*), 428 B.R. 776, 788 (Bankr. N.D. Ohio 2010) ("[T]his Court finds Plaintiff's allegations regarding implied representations and/or warranties regarding Debtor's qualifications, ability, experience, skill and/or workmanship to be insufficient to support a cause of action under 11 U.S.C. § 523(a)(2)(A).").  Accordingly, the Court cannot conclude that the oral representation by Liatos as to his experience as a mechanic was a misrepresentation.

#### b.  The Statement that the Corvette Was "Fine"

Mr. Miller testified that at the initial meeting with Liatos to see the Corvette, he "asked [Liatos] if anything was wrong with the car and he said, no, the car was fine. . . .  I said if anything is wrong with the car, let me know because I probably wouldn't be getting it because I don't know nothing about mechanics."  First Tr. at 6.  Given the great generality and lack of specificity of the statement that the

--------

*Gem Ravioli, Inc. v. Creta* (*In re Creta*), 271 B.R. 214, 220 (B.A.P. 1st Cir. 2002).  The instant matter does not involve a professional license, and there is no basis to conclude that the recitation by Liatos of his experience as a mechanic constitutes a warranty of his competence or workmanship.  The Court is not aware of any decision that has so expanded a mere statement of experience where no professional licensure is implicated.  Finally, there is no evidence that the representation Liatos made regarding his experience was, in fact, false.

Corvette was "fine," the Court must find that Liatos did not make a misrepresentation in this regard.

### C.  Did Liatos Know the Representations Were False at the Time He Made Them?

Having concluded that Liatos made misrepresentations regarding the Transmission being rebuilt and the extent of the Completion Items, the Court must next examine if Liatos knew at the time he made the representations that they were false.

#### 1.  The Transmission

As noted previously, the testimony of Wedeman convinces the Court that the Transmission Liatos installed was not a rebuilt transmission.  Second Tr. at 17-18.  However, the evidence also persuades the Court that Liatos did not know this representation was false.  Liatos convincingly testified that, when he purchased the Transmission, the seller represented to him that it was rebuilt.  *Id*. at 24, 33-34, 37-38.  Liatos further testified that he did not inspect the Transmission and never operated the Corvette after installing it.  *Id*. at 35-36.  Miller adduced no evidence to contradict these assertions by Liatos. Accordingly, the weight of the evidence here persuades the Court that Liatos did not know his representation that the Transmission was rebuilt was false.  It is axiomatic, then, that if Liatos did not know this representation was false, he could not have intended to deceive Miller in making the representation that the Transmission was rebuilt.

#### 2.  The Completion Items

There is likewise no evidence that Liatos knew at the time he placed the Ad that other items besides those on the list of Completion Items were needed to complete restoration of the Corvette.  At the time Liatos placed the Ad, the Corvette was inoperable and apparently had been for a substantial period of time.[13]  Many of the repairs Miller undertook after purchasing the Corvette appear to be to

---

[13] Liatos testified that when he purchased the Corvette, it did not have an engine or transmission.  Second Tr. at 38.  Further, there was no evidence adduced to suggest that the

repair of work originally done by Liatos, and there is no evidence Liatos knew any of his work was

defective. Thus, it is also axiomatic here that if Liatos did not know this representation was false, he

could not have intended to deceive Miller by representing that the Completion Items were all that

remained to complete the Corvette's restoration.

### D.  Justifiable Reliance

While the Court has concluded as to the various alleged misrepresentations by Liatos that either

no misrepresentation was made or Liatos had no knowledge that any misrepresentations he did make

were in fact false, the circumstances in the instant matter require the Court to nonetheless address the

additional element of whether Miller justifiably relied upon either of the misrepresentations here. Judge

Kenney of this Court has explained this requirement:

> In 1995, the Supreme Court issued its decision in the case of *Field v. Mans*, 516
> U.S. 59 (1995).  In *Field v. Mans*, the Court decided that, in order to prove a case of
> actual fraud under Section 523(a)(2)(A), the Plaintiffs needed only to prove "justifiable
> reliance," not the more demanding standard of "reasonable reliance." *Id.* at 77.  Relying
> on the Restatement (Second) of Torts, as well as W. Prosser, *Law of Torts*, (4th Ed.
> 1971), the Court explained the standard of justifiable reliance as follows:
>
> > . . . a person is justified in relying on a representation of fact "although
> > he might have ascertained the falsity of the representation had he made
> > an investigation." [Restatement (Second) of Torts], § 540.  Significantly
> > for our purposes, the illustration is given of a seller of land who says it
> > is free of encumbrances; according to the Restatement, a buyer's
> > reliance on this factual representation is justifiable, even if he could have
> > "walked across the street to the office of the register of deeds in the
> > courthouse" and easily have learned of an unsatisfied mortgage.
> > [Restatement (Second) of Torts], § 540, Illustration 1.  The point is
> > otherwise made in a later section noting that contributory negligence is
> > no bar to recovery because fraudulent misrepresentation is an intentional
> > tort.  Here a contrast between a justifiable and reasonable reliance is
> > clear: "Although the plaintiff's reliance on the misrepresentation must
> > be justifiable . . .  this does not mean that his conduct must conform to
> > the standard of the reasonable man.  Justification is a matter of the

---

Corvette was ever operative when Liatos owned it.

> qualities and characteristics of the particular plaintiff, and the
> circumstances of the particular case, rather than of the application of a
> community standard of conduct to all cases." *Id.*, § 545A, Comment *b.*

*Hong v. Merzoug* (*In re Merzoug*), Adv. No. 11-01228, 2012 WL 845528, at *3-4 (Bankr. E.D. Va. Mar. 12, 2012) (slip copy) (quoting *Field v. Mans*, 516 U.S. 59, 70-71 (1995)).  Notwithstanding the application of a subjective standard to measure reliance, a plaintiff may not simply choose to ignore any "warning signs."  As Judge Aron has explained:

> Nevertheless, a plaintiff is still "'required to use his senses, and cannot recover if he
> blindly relies upon a misrepresentation the falsity of which would be patent to him if he
> had utilized his opportunity to make a cursory examination and investigation.'" *Id.* at
> 71, 116 S. Ct. 437 (quoting Restatement (Second) of Torts § 541 cmt. a (1976)).  Thus,
> a plaintiff who disregards "red flags" will not be able to satisfy the justifiable reliance
> standard. *Giovanni v. Grayson, Kubli, & Hoffman* (*In re Giovanni*), 324 B.R. 586, 594
> (E.D. Va. 2005) (citing *Anastas v. Am. Sav. Bank* (*In re Anastas*), 94 F.3d 1280, 1286
> (9th Cir. 1996)).  *See also Copper v. Lemke* (*In re Lemke*), 423 B.R. 917, 924-25 (10th
> Cir.  BAP  2010) (holding that reliance was not justifiable because plaintiff continued
> to lend money "after various red flags arose"); *Rice, Heitman & Davis v. Sasse* (*In re
> Sasse*), 438 B.R. 631, 650 (Bankr. W.D. Wis. 2010) (denying plaintiff-law firm's claim
> pursuant to § 523(a)(2)(A) where plaintiff-law firm "ignored numerous red flags and
> warning signs"); *Andresen & Arronte, PLLC v. Hill* (*In re Hill*), 425 B.R. 766, 779
> (Bankr. W.D.N.C. 2010) (concluding that the plaintiff-law firm did not justifiably rely
> on the debtor's false representations because it continuously ignored warning signs
> regarding her financial condition); *Dominion Va. Power v. Robinson* (*In re Robinson*),
> 340 B.R. 316, 349-50 (Bankr. E.D. Va. 2006) (holding that plaintiff did not justifiably
> rely on debtor's false representations because it continuously ignored "red flags"
> regarding debtor's behavior); *Weeber v. Boyd* (*In re Boyd*), 322 B.R. 318, 325-26
> (Bankr. N.D. Ohio 2004) (holding that the plaintiff's reliance was not justifiable
> because he had "special knowledge" of the risks associated with lending the debtor
> money).

*Winston-Salem City Employees' Fed. Credit Union v. Casper* (*In re Casper*), 466 B.R. 786, 794 (Bankr. M.D.N.C. 2012).

Miller and her husband candidly admitted, both to Liatos prior to the purchase as well as at trial, that they were inexperienced in purchasing a vehicle needing restoration and did not possess any extensive mechanical knowledge or experience.  First Tr. at 6, 32-33, 44.  However, they were

investigating the purchase of a thirty-three year old automobile that was inoperable and admittedly only partially reconstructed. The evidence before the Court is that the Millers' due diligence consisted only of a conversation with Liatos and an examination of the Corvette's appearance to confirm that some of the work set forth in the Ad had been completed. No other investigation was done by Miller or Mr. Miller. Even given the subjective standard imposed by justifiable reliance, and the admitted novelty of this purchase, when confronted by the circumstances of an aging, partially assembled, inoperable vehicle that had been in the process of reconstruction for several years by a private individual, a purchaser without any experience in either making such a purchase or restoring automobiles who makes only a cursory inspection of the Corvette with no solicitation of an inspection by a third party falls short of even the subjective standard contemplated by justifiable reliance. Accordingly, even if this Court's earlier conclusions are incorrect as to the making and knowledge of the falsity of any misrepresentations, the Court believes Miller has failed to demonstrate justifiable reliance in any event.

### E. Objection to Discharge

Liberally construing the allegations contained in the Complaint, Miller asserts that the Court should deny Liatos his Chapter 7 discharge on the basis that he has underreported the value of his tools and overstated the amounts of certain of his monthly living expenses on his bankruptcy schedules, including utility costs (specifically, telephone, cable, and internet services), clothing, medical and dental expenses, and automobile insurance.[14] These allegations sound under Section 727(a)(4) of the

---

[14] As an apparent additional basis for objecting to the discharge of Liatos, Miller cites 11 U.S.C. § 522(d)(6), which limits the value that a debtor may exempt in tools. This section of the Bankruptcy Code is inapplicable in the instant proceeding, as Virginia has opted out of the federal statutory exemption scheme and instead employs the exemption laws enacted by the Virginia General Assembly. *See* Va. Code Ann. § 34-3.1; *Bunker v. Peyton* (*In re Bunker*), 312 F.3d 145, 151 (4th Cir. 2002). In the instant matter, assuming *arguendo* that exceeding the permitted statutory exemption is a proper basis for objecting to a debtor's discharge, and further assuming that Miller had cited the correct applicable statutory section, facially it appears that

23

Bankruptcy Code, which denies a debtor a discharge where "the debtor knowingly and fraudulently, in or in connection with the case [] made a false oath or account . . . ." 11 U.S.C. § 727(a)(4). As this Court recently held:

> [t]o deny a debtor [his] discharge under § 727(a)(4)(A), the objecting creditor must prove that "1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." *Faircloth v. Palmer* (*In re Palmer*), Adversary No. 06-76, 2007 WL 2253274, at *3 (Bankr. N.D. W. Va. Aug. 1, 2007) (citing *Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 685 (6th Cir. 2000)). The party objecting to discharge has the burden of proof by a preponderance of the evidence pursuant to Federal Rule of Bankruptcy Procedure 4005.

*Johnson-Clayton v. Ferebee* (*In re Ferebee*), Adv. No. 10-07086-SCS, 2012 WL 506740, at *12 (Bankr. E.D. Va. Feb. 15, 2012) (slip copy).

Miller provides little evidence in support of her contentions Liatos should be denied a discharge due to his alleged false statements in his bankruptcy schedules. As evidence that Liatos failed to disclose all of his tools, Miller offers a picture of the Corvette with some tools in the background as contained in the Ad. *See* Plaintiff's Exh. 1-A. No evidence was introduced to contradict the testimony of Liatos that he had previously liquidated many of his tools. As to the monthly expenses represented by Liatos, Miller simply offers, "I figured that if he was misrepresenting me on the purchase of this car that maybe he was misrepresenting the courts . . ." Second Tr. at 32, and, founded on her own personal experiences, Liatos' expenses seemed high. *Id.* at 32-33; *see also* First Tr. at 40. These conclusory allegations, without further evidence that the value of the tools and the amounts of the monthly expenses are false, or to satisfy any of the other requisites, are insufficient to enable the Court to

---

Miller's argument would still fail. The appropriate code section, Virginia Code Ann. § 34-26(7), permits a debtor to exempt of tools of the trade up to $10,000.00 in value, and Liatos exempted $2,000.00 in tools labeled as "Mechanics Tools and Tool Box." In any event, insufficient evidence has been adduced on this point, and the Court finds that such argument does not provide a basis for denying Liatos his discharge.

conclude that Liatos made a false oath so as to deny his discharge.

## Summary

The Court is not without empathy for Miller. Few individuals manage to traverse life without buying a used car that fails to meet expectations and that leads to regret over the decision to purchase it. However, despite the understandable angst of Miller over the repairs necessitated on the Corvette, there is no basis on the record before the Court to find the debt arising from the judgment obtained by Miller against Liatos to be nondischargeable. Further, there is no basis on the record before the Court to deny the discharge of Liatos. A separate Order dismissing the Complaint will be entered by the Court.[15]

Miller is advised that an appeal lies from this matter to the United States District Court for the Eastern District of Virginia. Except as provided in Federal Rules of Bankruptcy Procedure 8002(b) and 8002(c), any notice of appeal must be filed with the Clerk of this Court within fourteen (14) days of the date of entry of the order to be entered by the Court. The filling fee for a notice of appeal is $298.00.

The Clerk is directed to forward a copy of this Memorandum Opinion to Lynne C. Miller, *pro se* Plaintiff; to James E. Bowman, II, counsel for Liatos; and to Debera F. Conlon, Assistant United States Trustee.

**Entered at Norfolk in the Eastern District of Virginia on this 8th day of August, 2012.**

STEPHEN C. ST. JOHN
United States Bankruptcy Judge

---

[15] As a result of these findings, the Court finds that the oral motion for judgment as a matter of law made at the conclusion of the first day of trial by counsel for Liatos is moot.

**APPENDIX A**

norfolk craigslist > cars & trucks - by owner                    email this posting to a friend

Avoid scams and fraud by dealing locally! Beware any deal involving Western Union,
Moneygram, wire transfer, cashier check, money order, shipping, escrow, or any promise of
transaction protection/certification/guarantee. *More info*

please flag with care:

miscategorized

prohibited

spam/overpost

best of craigslist

# '76 Corvette Stingray (last chance, best offer over 10,000!) - $10000 (Red Mill (Va Beach))

Reply to: sale-pvnxw-1120800098@craigslist.org [Errors when replying to ads?]
Date: 2009-04-13, 5:48PM EDT

1976 Corvette Stingray

THIS OFFER IS ONLY GOOD FOR THREE DAYS. IF IT DOESN'T SELL, I WILL PUT THE CAR
IN STORAGE AND WAIT FOR A BETTER ECONOMY! MY LOSS IS YOUR GAIN. ACT NOW!

Dark Red Exterior with Black Interior
350 Cubic Inch Engine
4 speed Transmission, Power Steering, Power Brakes, Air Conditioning, Power Windows, Power
Antenna, Rear Window Defrost

I am selling my '76 Corvette. I've been working on rebuilding this car for the past three years and I have
a lot of time as well as money invested in it.

Detailed Description:

ENGINE--
The engine is a professionally built 350 cubic inch 4 bolt main engine with a steel crankshaft, 10 to 1
compression ratio, mid-range cam with roller rockers. Engine accessories include new milodon 6 Qt oil
pan, new aluminum timing cover, new H.P. harmonic balancer, new hooker ceramic coated super comp
headers, new mallory distributor, spark plug wires, accel spark plugs, new Eddel Brock polished air gap
intake manifold, new holley 670 CFM street avenger polished carb with Mr. Gasket fuel pressure
regulator and gauge, New billet aluminum custom engraved air cleaner, new polished holley mechanical
fuel pump with new fuel lines from gas tank to carb, new 175 H.P. shot N.O.S. with separate fuel line,
holley 110 GPH fuel pump, 5 micron filter, low fuel pressure switch, fuel pressure regulator & gauge.
NOS pressure gauge, new march industries serpentine belt setup with polished aluminum accessories
and pulleys, new starter, new aluminum valve covers, new polished alternator.

CLUTCH--
New zoom clutch, new clutch linkage from clutch pedal down to and including clutch fork steel
flywheel & Lakewood scattershield, new clutch safety start switch and linkage.

TRANSMISSION--
Rebuilt M-21 4 speed Trans with new hurst linkage, new back up light switch, bracket, and linkage.
New reverse lockout cable and brackets.

REAR END--
Rebuilt and resealed

I-A

Drive shaft & half shaft--sandblasted & painted with new U-joints.
Trailing Arms-- Powder coated offset trailing arms with new bushings, bearings, and seals (2" offset for wider rear tires).

BRAKES--
Rebuilt power booster, master cylinder and calipers, new stainless steel brake lines, braided steel flex lines, rotors, brake pads, front wheel bearings and seals. Also new stainless steel emergency brake system.

STEERING--
New rack and pinion steering system with braided steel hoses, new polished aluminum power steering pump and reservoir.

SUSPENSION--
New VB&P front and rear suspension, adjustable ride height and spring tension on all 4 wheels, has tubular front upper and lower control arms as well as composite leaf spring on front and rear.

HEATING AND COOLING--
Radiator cleaned, pressure tested and painted, new heater core, heater control valve, upper and lower radiator hoses, thermostat, heater blower motor, vacuum lines, braided steel heater hoses, as well as 2 electric cooling fans for engine and A/C system and new water pump. New overflow bottle with hoses and new radiator cap

AIR CONDITIONING SYSTEM--
New polished aluminum a/c compressor, evaporator, condenser, V.I.R. (receiver/dryer), high pressure a/c lines. This system is set up for R-134 refrigerant. Note: Need to have a custom line going to a/c compressor to finish a/c system.

VACUUM LINES--
All vacuum lines are new for headlight system and heating and a/c system.

ENGINE BAY AND UNDERCARRIAGE--
Has been cleaned and repainted.

INTERIOR--
Reupholstered seats, new seat belts, carpet, sill plates, upper and lower dash pads, new lenses for all instruments, new center and brake consoles, new kick panels, new quarter panels, rear window surround panels and roof panels, new storage compartment assembly with new insert trays, new battery. New headlight switch and vacuum over-ride switch.

RADIO--
New USA 1 AM/FM Radio with 10 disc CD changer and power antenna, new sound bar (rear speakers), new front speakers.

STEERING COLUMN--
Tilt/telescoping steering wheel. Disassembled, cleaned, repainted. New bearings, ignition switch and lock cylinder, new turn signal and tilt levers. New wood grain steering wheel.

DOORS--
New exterior door handles, door lock cylinders, all parts cleaned and regreased. New window track bushings, deluxe door panels and lock knobs. New power window motors, power window switches, relay & circuit breaker, new exterior window seal. Rebuilt power window regulators.

I-A

'76 Corvette Stingray (last chance, best offer over 10,000!)

Case 11-07052-SCS   Doc 78   Filed 08/08/12   Entered 08/08/12 14:42:32   Desc Main

Page 3 of 4

Document      Page 28 of 29

MISC.--
New windshield washer bottle pump & lines, new alarm switch cylinder.

NOTE:
All braided steel lines are real braided steel with AN fittings, not the cheap lines you would buy in auto
parts stores.

THINGS NEEDED TO COMPLETE THIS CAR
1. Exhaust system (I have new hooker mufflers that come with the car).
2. Wheel alignment
3. Engine fine tuned (engine runs already, but will just need this after exhaust is installed)
4. Small crack in windshield. Will pass VA State inspection w/o replacing it.
5. Paint it your color. Note: I replaced the hood with a twin turbo hood for more clearance under the
hood. Also, old hood had a large hole cut in it from previous owner.
6. Manufacture and install a/c line for a/c compressor & charge a/c system.
7. Finish installing seats, center console, and door panels (I have all these parts already).

CONCLUSION:
I have spent 3 years and over $25,000 on this car. I have over 30 years experience as a mechanic (five of
those years restoring Corvettes). I was building this car for myself, but my life has changed so the car
has to go, as sad as that is to me.... however, it will make someone else very happy! This is a "must see
to appreciate" deal!

I have done a ton of work to this car, so there are probably some things that I have forgotten to list here
and some questions that may not be answered here, so please don't hesitate to email or call me with your
questions.
Email Larry at corvetteman1960@gmail.com. My phone number is 757-619-6699. Thanks for taking
the time to read my ad.

- Location: Red Mill (Va Beach)
- it's NOT ok to contact this poster with services or other commercial interests




I-A




PostingID: 1120800098

Copyright © 2009 craigslist, inc.        terms of use        privacy policy        feedback forum

I-A